UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RANDOLL D. JOHNSON, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:21-cv-03021-TWP-TAB |
| ) | |
| EMILY KARDIS, ) | |
| CHRISTINA LIEDTKE, ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant Emily Kardis' and Christina Liedtke's (collectively the "Defendants") Motion for Summary Judgment (Dkt. 27). *Pro se* Plaintiff Randoll D. Johnson, Jr., ("Mr. Johnson") initiated this civil rights action alleging that Defendants, two mental health care providers at Pendleton Correctional Facility ("Pendleton"), were deliberately indifferent to his serious mental health needs while he was enrolled in the Intensive Residential Treatment ("IRT") Program. Because the undisputed evidence shows that Mr. Johnson received constitutionally adequate treatment, the motion is **granted**.

**I.    STANDARD OF REVIEW**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Federal Rule of Civil Procedure 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Schs.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

In this case, despite Defendants having notified Mr. Johnson of his right to respond to and submit evidence in opposition to motion for summary judgment, (Dkt. 30), Mr. Johnson failed to respond to the summary judgment motion. Accordingly, facts alleged in the motion are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); *see* S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts). "Even where a non-movant fails to respond to a motion for summary judgment, the movant still has to show that summary judgment is proper given the undisputed facts." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (cleaned up).

## II.  FACTUAL BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). As noted earlier, Mr. Johnson has not responded to the summary judgment motion, so the Court treats Defendants' supported factual assertions as uncontested. *See Hinterberger v. City of Indianapolis*, 966 F.3d 523, 527 (7th Cir. 2020); S.D. Ind. L.R. 56-1(b), (f).

**A.  Background of the Intensive Residential Treatment (IRT) Program and Parties**

The IRT Program at Pendleton is a specialized mental health treatment unit, with a specialized mental health treatment program, designed to address and treat inmates with serious mental illnesses. (Dkt. 29-1 at ¶ 3.) Treatment in the IRT Program consists of hours of group therapy per week, individualized therapy once per month, access to a counselor, staff that complete rounds in the housing units, and psychiatrists to conduct medicine-related evaluations. *Id.* at ¶¶ 29, 31. Further, patients in the IRT Program can request additional mental health treatment by submitting a healthcare request form. *Id.* at ¶ 29.

Mr. Johnson has struggled with mental illness since he was six years old. (Dkt. 29-4 at 9 (30:22−24).)[1] He has a history of diagnoses of schizophrenia, bipolar disorder, and major depressive disorder and had been hospitalized at Logansport State Hospital for a competency evaluation before his arrival to the Indiana Department of Correction ("IDOC"). (Dkt. 29-3 at

---

[1] With respect to Mr. Johnson's deposition at Docket 29-4, the Court first cites to the page of the PDF, then to the pages and lines of the deposition. The Court refers to the page number of the PDF for Mr. Johnson's mental health records at Docket 29-3.

5−7.) Mr. Johnson has a history of suicide attempts and had been prescribed antidepressants before his incarceration. *Id.* at 5. He had stopped taking the medications due to side effects. *Id.*

At the Reception Diagnostic Center, Mr. Johnson was diagnosed with Antisocial Personality Disorder but not any depressive disorder because the evaluating psychiatrist was unable to identify enough symptoms to meet the criteria for a depressive disorder. (Dkt. 29-3 at 10−13.) Upon his transfer to Pendleton, he was placed in the IRT Program. (Dkt. 29-1 at ¶ 8.)

Emily Kardis, PsyD ("Dr. Kardis"), is a psychologist licensed to practice in Indiana. (Dkt. 29-1 at ¶ 1.) She was employed by Wexford of Indiana, LLC ("Wexford"), as a psychologist at Pendleton from April 1, 2017 through April 2019, when she transferred to Logansport Juvenile Facility. *Id.* at ¶¶ 2, 27.

Christine Liedtke, PsyD ("Dr. Liedtke"), is a psychologist licensed to practice in Indiana. (Dkt. 29-2 at ¶ 1.) From May 20, 2019 through June 30, 2021, she was a psychologist at Pendleton employed by Wexford. *Id.* at ¶ 2. Since July 1, 2021, she has been employed in this capacity by Centurion LLC, IDOC's current healthcare provider. *Id.* at ¶ 3.

Both Dr. Kardis and Dr. Liedtke treated patients in Pendleton's IRT Program. (Dkt. 29-1 at ¶ 3.) However, because neither Dr. Kardis nor Dr. Liedtke is a psychiatrist, they do not prescribe medication. (Dkt. 29-1 at ¶¶ 31, 32; Dkt. 29-2 at ¶ 33.)

B.    **Mr. Johnson's Mental Health Treatment in IRT, November 2018 through April 2020**

Upon Mr. Johnson's arrival to the IRT Program on November 29, 2018, he was placed on suicide watch for suicidal ideation. (Dkt. 29-3 at 15, 22.) Dr. Kardis met with Mr. Johnson that evening, where they discussed his prior mental health history and his current status. *Id.* at 22. Based on their conversation, Dr. Kardis decided it was appropriate to remove Mr. Johnson from suicide watch. (Dkt. 29-1 at ¶ 8.) Dr. Kardis saw Mr. Johnson again on November 30, 2018, for

4

a follow-up appointment, in which they discussed the IRT Program and specific privileges associated with each phase of the program. (Dkt. 29-3 at 25−26.)

On December 6, 2018, Dr. Kardis saw Mr. Johnson for a one-week follow-up and found he was adjusting well to the IRT Program. *Id.* at 27−28. She also completed a lengthy intake form, which was a review of Mr. Johnson's mental health history, his prior medications, and his history of five suicide attempts, in order to further educate treatment staff at the facility. (Dkt. 29-1 at ¶ 11; Dkt. 29-3 at 29−34.) The last psychotropic medication prescribed to Mr. Johnson had been Celexa, an antidepressant, that was last prescribed to him in January 2018. *Id.* at 30.

Mr. Johnson participated in group therapy without incident in December 2018. *Id.* at 34−35. On December 11, 2018, Mr. Johnson was evaluated by psychiatrist Dr. Esther Schubert ("Dr. Schubert"). (Dkt. 29-3 at 41.) At this visit, Dr. Schubert did not prescribe Mr. Johnson any medication. *Id.* at 41−44.

Dr. Kardis next saw Mr. Johnson on December 27, 2018. (Dkt. 29-1 at ¶ 14.) During this visit, Mr. Johnson was irritable, angry, and hostile, stating he was upset that he only was seen once a month by his therapist and did not understand how he could be treated and diagnosed with the treatment offered in IRT. *Id.* Dr. Kardis found Mr. Johnson's anger was difficult to redirect. *Id.* She believed that his Antisocial Personality Disorder and anger should be the focus of treatment and provided him a packet on anger management. *Id.*

On January 2, 2019, Dr. Schubert saw Mr. Johnson again. They discussed possible medication options, but Mr. Johnson refused all forms of medication that were offered. (Dkt. 29-3 at 114−17.)

Dr. Kardis met with Mr. Johnson on January 24 and February 4, 2019. (Dkt. 29-1 at ¶¶ 17, 18.) During the January meeting, Mr. Johnson was irritable and refused to use an anger journal or

complete the anger management packet. *Id.* at ¶ 17. During the February meeting, they discussed his placement on a custody hold for refusing to follow staff directions and custody staff's determination that he shouldn't attend group therapy due to his inappropriate behavior. *Id.* at ¶ 18; Dkt. 29-3 at 120−25.

On February 7, 2019, Mr. Johnson was placed on suicide watch after he made superficial scratches on his arms. (Dkt. 29-3 at 126.) Dr. Kardis spoke with Mr. Johnson when he was on suicide watch on February 11 and 12, 2019. (Dkt. 29-1 at ¶¶ 19, 20.) At their first meeting, Mr. Johnson asked to be removed from the IRT Program because he was not fit to work with psychiatric patients. (Dkt. 29-3 at 126.) At the second meeting, Mr. Johnson initially indicated that he no longer felt suicidal. *Id.* at 129. He then became angry when Dr. Kardis said he would need to check with appropriate IDOC staff about his conduct reports, and Mr. Johnson switched course and said he was feeling suicidal. *Id.* Dr. Kardis decided to leave him on close suicide watch. *Id.* Dr. Kardis began the reintegration process of removing Mr. Johnson from suicide watch the following day. *Id.* at 47−49.

Dr. Kardis met with Mr. Johnson on February 27, 2019, for a two-week suicide watch follow-up appointment. *Id.* at 50. Mr. Johnson denied suicidal ideation and said he was glad to be back in the D housing unit. *Id.* Mr. Johnson began to complain about various IDOC policies, and Dr. Kardis reminded him that the purpose of therapy was to address his mental health issues and noted his informal grievances that complained about his lack of mental health treatment. *Id.* Mr. Johnson became irritable, and the session was ended. *Id*.

On March 6, 2019, Mr. Johnson had another appointment with psychiatrist Dr. Schubert. *Id.* at 52. Dr. Schubert observed that Mr. Johnson was argumentative and that, although he complains about his lack of treatment, he frequently refuses appointments. *Id.* Dr. Schubert did

not prescribe any medication based on her assessment that he did not "have any psychosis, mood disorder, or other medicine treatable illness." *Id.*

On March 14, 2019, Dr. Kardis participated in a treatment team meeting regarding Mr. Johnson with several other mental health professionals and caseworkers. *Id.* at 56−57. At the meeting, which Mr. Johnson attended, the staff agreed that Mr. Johnson was not utilizing the entirety of the available services in the treatment program, and he was monopolizing his individual therapy sessions to complain about the program and how he felt wronged by custody staff. (Dkt. 29-1 at ¶ 24.) They believed that Mr. Johnson was hard to redirect, and his anger was often difficult to manage. *Id.* He was also filing grievances reporting that he was not receiving adequate treatment but was not taking advantage of those treatments offered. *Id.* Staff also noted that his attendance at group therapy was sporadic because he did not wish to attend groups that were facilitated by certain behavioral health specialists. *Id.* Despite Mr. Johnson's lack of success in the IRT Program, at that time, the team decided the plan was to continue moving towards Mr. Johnson's treatment goals. *Id.*

Dr. Kardis also met with Mr. Johnson that day, and they discussed his non-compliance with treatment and his refusal to attend or participate in individual and group therapy. (Dkt. 29-3 at 58-59.) Mr. Johnson became irritated, raised his voice to Dr. Kardis, and called the group facilitator he dislikes a "piece of shit." *Id.* at 59. At that point, Dr. Kardis ended the meeting and determined that Mr. Johnson's treatment goal would continue to focus on his anger management. *Id.*

Dr. Kardis' last meeting with Mr. Johnson was on April 11, 2019, for an individual treatment session. (Dkt. 29-1 at ¶ 26.) At the meeting, they discussed goal setting, and Mr. Johnson stated he did not like setting goals because he might not achieve them, and then he started

7

to complain about staff. (Dkt. 29-3 at 62.) Dr. Kardis was able to redirect him to discuss problem-solving, and she recommended that he continue on the current treatment plan. *Id*.

Dr. Kardis was transferred to Logansport Juvenile Facility after this meeting, and she had no further involvement in Mr. Johnson's care. (Dkt. 29-1 at ¶ 28.)

C.  **Mr. Johnson's Mental Health Treatment in IRT, May 2019 through May 2021**

Dr. Liedtke did not have as much direct contact with Mr. Johnson as Dr. Kardis did, as her involvement was limited to participating in team meetings concerning his treatment plan. (*See* Dkt. 29-3).

On May 29, 2019, Dr. Liedtke participated in a treatment team meeting concerning Mr. Johnson's current diagnosis and his progression in the IRT program. (Dkt. 29-3 at 64-66.) Mr. Johnson did not attend this meeting. *Id.* at 65. The team discussed that Mr. Johnson was primarily occupied with wanting to progress through the phases of the program. *Id.* He was noted to be irritable and hard to redirect. *Id.* At that time, the team determined he should continue in the IRT Program with the treatment goal of stabilizing his mental health symptoms and developing more anger management skills. *Id.*

Mr. Johnson refused two psychiatry appointments in June 2019. *Id.* at 67-70.

Mr. Johnson met with his mental health counselor Herbert Troyer in July and August 2019. *Id.* at 71–76. Similar to his meetings with Dr. Kardis, Mr. Johnson largely complained about the ineffectiveness of the therapeutic programming in IRT. *Id*. Mr. Johnson also attended group therapy meetings at this time, but he did not engage with the activities and often required redirection. *Id.* at 78.

On August 21, 2019, Dr. Liedtke participated in a treatment team meeting about Mr. Johnson's current diagnosis and his progression in the IRT Program. (Dkt. 29-3 at 81.) Mr.

Johnson participated in this meeting until he began yelling at treatment team members and was ordered back to his cell. *Id.* Mr. Johnson's records were reviewed, and it was noted his current diagnosis was borderline personality disorder and anti-social personality disorder. *Id.* At this time, he was attending group therapy, would participate in the program when prompted, and had not received any recent conduct reports due to behavior. *Id.* The treatment team determined that he should remain in the program. *Id.*

In March 2020, another treatment team meeting was held at which Dr. Liedkte and Mr. Johnson participated. *Id.* at 85−86. Again, Mr. Johnson was ejected from the meeting after arguing with staff. *Id.* at 86. It was noted that Mr. Johnson was using "spice," an illegal drug, on a regular basis and that he may be better served in a drug program. *Id.* However, because he had no recent conduct reports, was trying to engage in group therapy, and was actively working on his anger and grief from a family death, it was determined he would remain in the IRT Program. *Id.*

On April 9, 2020, Dr. Carla Arellano ("Dr. Arellano") assessed Mr. Johnson. *Id.* at 88−90. They discussed his mental health history, and Dr. Arellano offered to prescribe Mr. Johnson Zyprexa to help with his aggression, but he declined. *Id.*

Throughout 2020, Mr. Johnson remained in the IRT Program, but his participation in the program steadily decreased. (Dkt. 29-2 at ¶ 22.) By September 2, 2020, during a treatment team meeting, it was determined that he be moved out of the program as he was not using it to deal with any of his mental health issues. *Id.*; Dkt. 29-3 at 92. He had been using drugs at a consistent rate and indicated that he would not stop, as he believed the IRT Program had not been effective for him. (Dkt. 29-3 at 92.) Mr. Johnson had to be locked down several times because he would go into cells with other offenders to use drugs. *Id.* Those in attendance at the meeting agreed that over time, Mr. Johnson could benefit from a move to a different housing unit. (Dkt. 29-2 at ¶ 22.)

Even though the decision had been made to transition Mr. Johnson out of the IRT Program, while he remained in the program he continued to receive access to individual and group therapy. (Dkt. 29-2 at ¶ 23; Dkt. 29-3 at 95−110.)

On October 7, 2020, Mr. Johnson was assessed by a psychiatrist, and he did not require any prescription for medication. (Dkt. 29-3 at 112−13.) Again, Mr. Johnson told the psychiatrist that he did not want to be on medication. *Id*.

On February 3, 2021, staff completed a discharge summary, in preparation for Mr. Johnson's eventual discharge from the IRT Program. (Dkt. 29-3 at 132.) This summary noted that Mr. Johnson had consistent access to group therapy and individualized therapy sessions, but would never complete any packets, follow-up on any skill exercises, or meaningfully engage in the program. *Id*. at 133−34. Mr. Johnson was demanding therapy sessions at least two times per week, and since he was not receiving it, he indicated that he would be refusing all IRT programming. *Id*.

Mr. Johnson was scheduled for two psychiatry appointments in March and April 2021, but he did not appear for either appointment. *Id*. at 136−38.

Mr. Johnson was eventually discharged from the IRT Program, and Dr. Liedtke had no further involvement in his case. (Dkt. 29-2 at ¶¶ 27, 29.) Although Mr. Johnson was no longer in the IRT Program, he had access to mental health treatment and was under the care of Dr. Akilah Lamar once he was placed in general population. *Id*. at ¶ 29; Dkt. 29-3 at 143−44.

D.     **Mr. Johnson's Claims**

Mr. Johnson filed this lawsuit because he was dissatisfied with the quality of mental health care offered in the IRT Program. He claims that the lack of mental health treatment resulted in a psychological breakdown and suicide attempt on May 1, 2021. He testified that he did not understand why he was diagnosed with Antisocial Personality Disorder when he had been

previously diagnosed with clinical depression. (Dkt. 29-4 at 5 (16:21−25).) He did not think he received enough individual counseling. *Id.* at 5 (17:15−19). Mr. Johnson characterized anger management and cognitive thinking programming as "a bunch of redundant garbage that wasn't helping." (Dkt. 29-4 at 5−6 (17:15−18:2).) He on one hand believed he should have been prescribed medication because of his suicidal ideation, *id.* at 7 (23:20−21), but on the other hand he did not want doctors to be treating him like a "guinea pig" by prescribing medicines with side effects, *id.* at 6 (20:18−25). Stated succinctly, Mr. Johnson believed that "these doctors are quacks. They don't care." *Id.* at 11 (42:8−10).

### III.   DISCUSSION

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

For the purposes of this motion, the Court assumes that Mr. Johnson's mental illness is a serious medical need. To survive summary judgment then, he must show that Defendants acted with deliberate indifference—that is, they consciously disregarded a serious risk to his health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Mr. Johnson "must provide evidence that [his medical provider] actually knew of and disregarded a substantial risk of harm." *Id*. "[A] jury can infer deliberate indifference when a treatment decision is 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted) (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)). But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently. *Id.* at 241−42. Additionally, "an inmate is not entitled to demand specific care and is not entitled to the best care possible…." *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011). Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm." *Id.*

The undisputed evidence shows that Dr. Kardis and Dr. Liedtke are entitled to summary judgment. When Mr. Johnson was under their care in the IRT Program, he received regular access to group therapy, individual counseling, and appointments with psychiatrists. (Dkt. 29-3.) Mr. Johnson refused to meaningfully participate in the therapeutic programming offered. He did not complete assigned packets or journal entries, and as his time in the program went on, he engaged less and less in group and individual therapy. (Dkt. 29-2 at ¶ 22; Dkt. 29-1 at ¶ 17.) Mr. Johnson often used his counseling sessions to complain about IDOC staff and policies rather than work on his mental health issues. (Dkt. 29-1 at ¶¶ 18, 20, 22.)

Despite Mr. Johnson's recalcitrant attitude, his mental health team did not give up on him. Rather, they encouraged him when he showed a modicum of progress, and they permitted him to remain in the IRT Program despite his lack of meaningful engagement. (Dkt. 29-1 at ¶ 24; Dkt.

29-3 at 81.)  Mr. Johnson was only removed from the program when the mental health treatment team determined that he was not using the program to deal with his mental health issues and he professed his intention to continue using illegal drugs. (Dkt. 29-3 at 92.)  And even after he was removed from the IRT Program, he continued to receive mental health treatment.  *Id.* at 143−44.

Further, any argument that Defendants were deliberately indifferent because Mr. Johnson did not receive appropriate medication fails for several reasons.  First, as psychologists, Dr. Kardis and Dr. Liedtke are not licensed to prescribe medication; that is the responsibility of a psychiatrist. (Dkt. 29-1 at ¶¶ 31−32; Dkt. 29-2 at ¶ 33.)  Second, Mr. Johnson had regularly scheduled appointments with psychiatrists.  (Dkt. 29-3 at 41−44, 52, 67−70, 88−90, 112−17, 136−38.)  At these appointments, the psychiatrists concluded that Mr. Johnson did not require medication, and—even when medication was offered to him—he declined to accept the medication. Other times, Mr. Johnson failed to attend the appointments.  Thus, there is no indication that they were deliberately indifferent to his need of medication when they consistently assessed his need and determined it was not needed.

Finally, although suicidal ideation is a serious medical condition, *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019), no reasonable juror could conclude that Defendants were deliberately indifferent to a risk that Mr. Johnson would commit suicide. Rather, when Mr. Johnson engaged in self-harm, Dr. Kardis placed him on suicide watch for monitoring.  (Dkt. 29-3 at 47−49, 126−29.)

The undisputed evidence shows that Dr. Kardis and Dr. Liedtke used their professional medical judgment in their treatment decisions for Mr. Johnson.  *Dean*, 18 F.4th at 241.  Mr. Johnson may not have been satisfied with the nature of the therapeutic programming in the IRT Program, but his "mere disagreement with a doctor's medical judgment is not enough to support

an Eighth Amendment violation." *Cesal v. Moats*, 851 F.3d 714, 723 (7th Cir. 2017) (quoting *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010)). Accordingly, summary judgment is **granted** in Defendants' favor.

## IV.    CONCLUSION

The Court is sympathetic to the significant challenges Mr. Johnson must face as a mentally ill prisoner. However, the undisputed evidence shows that Mr. Johnson received constitutionally appropriate mental health treatment while he was a participant in the IRT Program at Pendleton. For the reasons explained above, the Defendants' Motion For Summary Judgment, Dkt. [27], is **GRANTED**. Final judgment will issue in a separate entry.

SO ORDERED.

Date: 8/4/2023

_____
Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Randoll D. Johnson, Jr., #207839
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
STOLL KEENON OGDEN PLLC
doug.bitner@skofirm.com